**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROXANNE ROBINSON,

Plaintiff,

v.

UPMC PRESBYTERIAN SHADYSIDE and
INFECTIOUS DISEASE CONNECT, INC.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 22-29
Judge Nora Barry Fischer

## MEMORANDUM OPINION

### I.     INTRODUCTION

In this employment law case, Plaintiff Roxanne Robinson ("Robinson" or "Plaintiff") alleges that Defendants Infections Disease Connect ("ID Connect") and University of Pittsburgh Medical Center Presbyterian Shadyside ("UPMC") discriminated against her based on her age and race and that she was retaliated against for complaining about the discrimination.  (Docket No. 29).  Presently before the Court are three contested motions for summary judgment filed by Robinson, ID Connect, and UPMC which have been fully briefed and were argued at a motion hearing on September 18, 2023.  (Docket Nos. 61–72; 75–80; 84; 85–86; 88; 98).  The Court has since received and reviewed the official transcript of the proceeding and issued two rulings on objections to the admissibility of certain evidence as to the pending motion.  (Docket Nos. 93; 102; 105).  After careful consideration of the parties' arguments and the evidence presented in light of the standards governing motions for summary judgment, and for the following reasons, Robinson's motion [61] is denied, UPMC's motion [65] is granted, in part and denied, in part, and ID Connect's motion [69] is granted, in part and denied, in part.

1

## II.     FACTUAL BACKGROUND

ID Connect is a virtual telemedicine company which was the brainchild of two UPMC doctors, Rima Abdel-Massih and John Mellors.  (Docket No. 76 at 3).  They started the company within UPMC's Division of Infectious Disease but later created their own commercial entity.  (*Id*).  UPMC Enterprises fully funded the new venture and, as of July 31, 2023, still owned around forty percent of the company.  (*Id*; Docket No. 64 at 1–2).

After its founding, ID Connect remained affiliated with UPMC.  For a fee, it operated out of UPMC facilities and used UPMC computers.  (Docket Nos. 63-20 at 19:7–13; 64 at 2).  ID Connect entered into a Master Administrative Services Agreement ("MASA") with UPMC under which the latter performed various administrative services for ID Connect such as "general corporate services, including legal and advisory, and general and dedicated human resources services, as well as payroll and benefits."  (Docket No. 76 at 2).  And, as of January 2023, all of ID Connect's physicians were hired through UPMC and provided clinical care at UPMC sites. (Docket No. 64 at 5).

Roxanne Robinson, an African American woman, began working for ID Connect in September 2019, at the age of 60.  (Docket No. 80 at 1–2).  Robinson is a high school graduate. (Docket No. 72-5 at 4).  She studied communications at the University of Pittsburgh but did not earn a degree.  (*Id.*; Docket No. 81-17 at ¶ 33).  The company's CEO, David Zynn, recruited Robinson to join ID Connect as a credentialing specialist.[1]  (Docket No. 80 at 2).  At the time of her hire, Robinson had been working in healthcare for about fourteen years, thirteen of which she spent as a credentialing specialist.  (Docket No. 72-5 at 3–4).  Zynn and Robinson had previously

---

[1] "Credentialing is the process of assisting medical doctors in obtaining their licenses in several states, renewing expired certifications, and providing medical staff offices with all updated or new documentation."  (Docket No. 80 at ¶ 5).

worked together at a company called Iagnosis where Zynn was President and Robinson was a credentialing specialist.  (*Id.*).  From her date of hire at ID Connect through March 2020, Zynn directly supervised Robinson.  (*Id.* at 4).

At her first performance review in March 2020, Zynn rated Robinson as a "Solid/Strong/Good Performer," but he noted that she should strive to "be more open minded to changes in process/systems/automation," "[w]ork proactively through issues," and "[b]e more hands on and proactive with" a new software program called Modio.  (Docket No. 72-9 at 3–5).  Around this same time, Robinson received a pay raise, which was processed on UPMC's systems. (Docket Nos. 63-5; 76 at 4–5).

Nancy Zimmerman became Robinson's direct supervisor in April 2020.  (Docket No. 80 at 4).  Zimmerman, who was working concurrently for UPMC Enterprises as an Executive in Residence, served as the Director of Clinical Operations for ID Connect.  (*Id.*; Docket No. 64 at 3).  Shortly thereafter, Zimmerman began recording issues with Robinson's performance.  (Docket No. 81-13).  On June 1, 2020, Abdel Massih forwarded an email conversation between her and Robinson to Zimmerman.  (Docket No. 97-5 at 18).  Abdel Massih asked Zimmerman to retain the correspondence "for the records" as evidence that Robinson failed to timely submit Abdel Massih's credentialing information in April, when she completed the necessary paperwork.  (*Id.* at 18–20).  In a follow-up email exchange, Abdel Massih expressed her "deep concerns" to Zimmerman that Robinson was not communicating accurate information to doctors.  (Docket No. 81-13 at 2).  Zimmerman concurred, noting Robinson's "convoluted and often blatantly inaccurate pattern of communication."  (*Id.* at 1).

Around this same time, Robinson asserts that she approached Zimmerman about hiring another credentialing specialist who would report to Robinson.  (Docket No. 81-4; 81-17 at ¶ 25).

Robinson claims that Zynn had promised that she would become a manager within the company's credentialing department.  (Docket No. 81-17 at ¶ 25).  Instead of hiring her subordinate, ID Connect decided to seek out a Senior Credentialing Manager to supervise Robinson.  (Docket No. 80 at 6).

Abdel Massih and Zimmerman met with Robinson on July 30 to discuss her performance and inform her that ID Connect would be hiring a Senior Credentialing Manger.  (Docket No. 99-2 at 152).  Zimmerman reported that Robinson, contesting the notion that she needed to be managed, was upset about the company's decision.  (*Id.*).  ID Connect posted the position on UPMC's talent acquisition webpage on August 5.  (*Id.*; Docket Nos. 81-17 at ¶ 30; 104 at 12).  Robinson did not apply for the opening because the job posting required a college degree, which she did not have, and she believed that an application would be "futile."  (Docket No. 81-17 at ¶¶ 31, 33–34).

ID Connect hired Liyuen Wills in October 2020 to be the Senior Credentialing Manager.  (Docket No. 80 at 7).  Wills was born in Singapore in 1977 and moved to the United States in 1997.  (Docket No. 104 at 5).  She has three degrees from Western Governors University: a Bachelor's degree in human resources and health information management, a Master of Business Administration in health care administration, and a Master's degree in health leadership.  (*Id.* at 7–9).  Prior to working for ID Connect, Wills supervised a credentialing team of eighteen to twenty people at UPMC.  (*Id.* at 13–15).  Before that, she worked as a certified nursing assistant.  (*Id.* at 13).

Robinson was one of the credentialing specialists who worked under Wills at UPMC.  (81-17 at ¶ 36).  Robinson asserts that she was treated more poorly than "others" by Wills at UPMC.[2] (Docket No. 68-4 at 19.).  Robinson claims that she left UPMC to escape Wills' allegedly discriminatory behavior and to pursue "more money."  (*Id.* at 18; Docket No. 81-17 at ¶ 36).  With that said, Robinson does not provide any evidence that she complained about discrimination while she was employed at UPMC, and Robinson testified that she did not come to believe that Wills' harsh treatment was due to her race until sometime after leaving UPMC.  (Docket No. 68-4 at 18).  Robinson admitted that she never heard anyone use racial slurs or make any other racist comments while she worked at UPMC.  (Docket No. 68-4 at 3, 22).  At ID Connect, Wills directly supervised Robinson from October 2020 until Robinson's employment was terminated in March 2021.  (Docket No. 80 at 7).  Wills did not supervise any other employees during this time.  (Docket No. 72-3 at 248).

Despite having only supervised Robinson for the final quarter of 2020, Wills completed Robinson's annual performance review.  (Docket No. 72-15).  For help, she consulted Zynn's 2019 review and a quarterly review completed by Zimmerman.  (Docket No. 81-14 at 3).  Wills rated Robinson's performance as "Needs Improvement" or "Unsatisfactory" in most categories.  (Docket No. 72-15).  Based in part on this review, Zynn wrote to Daniele Crisi-Couchenour, UPMC Enterprises' Manager of Human Resources, that he, Zimmerman, and Wills were dissatisfied with Robinson's performance and that it would be necessary to place her on a Performance Improvement Plan ("PIP").  (Docket Nos. 63-3 at 2; 81-14 at 1).

---

[2] Robinson does not explain whether these other UPMC employees were within her protected class or present evidence that she and the "others" were "similarly situated in all respects."  *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (brackets and citation omitted).

Wills met with Robinson on February 8 to discuss her performance review and place her on the PIP.  (Docket No. 80 at 9).  ID Connect followed a UPMC process to issue the PIP, and it was completed on a "UPMC Performance Plan Document."  (Dockets No. 63-6; 76 at 5).  The PIP period ran from February 9 to March 27.  (Docket Nos. 72-17 at 1; 80 at 9).

The PIP identified six problem areas.  (Docket No. 72-17 at 2–4).  It noted that Robinson had failed to "provide[] an accurate update on each provider's credentialing process and a frank assessment of when privileges can be met;" to proactively identify problems rather than "wait[ing] to be contacted if there are issues;" "to pay sufficient attention to details" and provide accurate information; and to use SharePoint as directed.  (*Id.*).  It also stated that Robinson ignored assigned tasks that she felt were unnecessary and refused to use Modio, the credentialing software purchased by the company.  (*Id.* at 4).  The PIP highlighted several scenarios where Robinson's missteps either created credentialing issues or would have caused problems if not for intervention by a third party.  (*Id.* at 4–6).

ID Connect listed three "Goals and Objectives" in the PIP for Robinson to meet. (Docket No. 72-17 at 5–6).  First, she was directed to "[i]mprove oversight of credentialing process for providers seeking privileges or being licensed."  (*Id.* at 5).  To satisfy this goal, Robinson had to review and regularly update several reports and communicate with credentials verification offices, medical staff offices, and the ID Connect team when issues arose.  (*Id.*).  Next, Robinson was required to "[u]se Modio, and its functionalities as directed."  (*Id.*).  To meet this objective, Robinson had to upload documents, update certain information and reports within the software program, and review information for completeness.  (*Id.*).  Finally, Robinson was required to "[s]trengthen partnership with internal teams and foster positive interaction."  (*Id.* at 6).  To complete this goal, Robinson needed to "[p]rovide constructive feedback . . . yet commit to the

success of internal processes by moving forward with assigned tasks," maintain Modio profiles and documents up to date, and notify her superior by the next business day of areas of concern. (*Id.*).

As part of the PIP, Robinson and Wills met weekly via video chat to discuss Robinson's performance and progress towards PIP goals.[3]  (Docket No. 80 at 10).  According to both Wills and Robinson, these meetings were contentious.  Wills thought that Robinson was hostile and unprofessional.  (*Id.*).  And Robinson found Wills to be demeaning and condescending.  (*Id.*).

Wills summarized the weekly meetings in emails that she sent to Zynn, Zimmerman, and Crisi-Couchenour.[4]  On February 16, Wills noted seven issues with Robinson's progress towards PIP goals including one missed deadline, one communication failure, and several inadequacies pertaining to Robinson's use of Modio.  (Docket No. 99-2 at 92–93).  On February 24, Wills informed Zynn and Zimmerman that Robinson was making only "minor updates to Modio" and that she warned Robinson about "appearing to be insubordinate."  (*Id.* at 99).  Around this time, Zynn spoke with Robinson on the phone.  (*Id.* at 106–07).  Following the call, Zynn emailed his notes to Crisi-Couchenour on February 26.  (*Id.*).  Crisi-Couchenour suggested that if Robinson does not "work on her performance and interactions with [Wills] . . . we may need to move forward with terminating her employment."  (*Id.*).

At the PIP's midpoint, on March 3, Wills noted that Robinson had not met any of her PIP goals—eight of the thirteen PIP goals were "unmet" and five were marked "not applicable."  (*Id.* at 109–113).  Wills also identified four additional areas of concern.  (*Id.* at 113–15).

---

[3]      Robinson and Wills were working remotely due to the COVID-19 pandemic.  (Docket No. 68-4 at 10).
[4]      The meetings were also recorded, but none of these recordings have been provided to the Court as part of the summary judgment record.  (Docket No. 99-2 at 85).

Following this point, Robinson's performance appears to decline.  On March 11, Wills "highlight[ed] a pattern of [Robinson] refusing to be accountable for her mistakes, as well as significant gaps and lack of persistence in following up with providers." (*Id.* at 119).  And on March 16, Wills explained that Robinson "was rather contentious" at their weekly meeting and that she had expressed frustration about not receiving a March merit-based pay increase like many of her ID Connect coworkers.  (*Id.* at 116–18, 130).

Without waiting for the PIP period to conclude, Zynn and Crisi-Couchenour decided to fire Robinson.  On March 18, Wills sent Crisi-Couchenour a draft termination letter for her review which contained an effective termination date of "March 24, 2021."  (Docket No. 63-13 at 2). Crisi-Couchenour also emailed Amy Cook, UPMC Enterprises' Chief Talent Officer, requesting approval to fire Robinson because she "did not meet the expectations of her PIP."  (Docket Nos. 80 at 11; 63-16).  In the email, Crisi-Couchenour noted that Zynn was "aware and supportive of [Robinson's] termination."  (Docket No. 63-16).  Wills and Crisi-Couchenour exchanged additional emails on Monday, March 22, 2021, regarding how they would finalize the termination, including that Wills would send the termination email and attachments to Robinson at 9:00 a.m. on March 24, 2021 and that they planned to meet with Robinson on Teams at that time and record the meeting.  (Docket No. 99-2 at 140-141).

However, the following day, on March 23, Robinson emailed Crisi-Couchenour to report discrimination based on her age and race.  (Docket No. 72-20).  As to her complaints of discrimination, Robinson highlighted the following: she was the only African American employed by ID Connect in Pittsburgh; ID Connect hired Wills to be the Senior Credentialing Manager without giving Robinson the chance to compete for the position; Wills is a younger, non-African

American[5] woman; and Wills adversely reviewed Robinson's performance and placed her on the PIP.  (Docket No. 72-20).

Crisi-Couchenour investigated.  (Docket No. 72-21).  She spoke with Robinson on March 24.  (*Id.*).  Robinson testified that she did not tell Crisi-Couchenour when the discrimination occurred or who committed the acts of discrimination.  (*Id.*; Docket No. 72-3 at 57–69).  But she admitted that neither Zynn, Abdel Massih, Zimmerman, nor Wills "ever made any comments . . . related to [her] age and race," (Docket Nos. 72-21; 72-3 at 57–59), and that no one at IDC or UPMC ever made racist comments or used any racial slurs, (Docket No. 68-4 at 22).  Crisi-Couchenour concluded that there was "no evidence of discrimination based on [Robinson's] race or age."  (Docket No. 72-21).

Robinson was fired on March 30, 2021, for failing to meet the expectations of the PIP.  (Docket Nos. 63-15; 72-8).  The termination letter was issued by Wills on ID Connect letterhead, but it contained UPMC's Ethics and Compliance Statement.  (Docket No. 63-15).  Wills noted as a basis for termination that Robinson provided "incomplete" updates "regarding physician licensing and/or credentialing;" "failed to create tracking reports [in Modio] for most of the PIP's duration, noted incorrect dates in [her] documentation, and failed to include important details about each process;" "failed to follow through on instructions;" and behaved unprofessionally.  (*Id.*).  Crisi-Couchenour directed Robinson to contact UPMC's Retirement Center to discuss handling of her retirement benefits and completed unemployment compensation forms for Robinson listing her employer as "UPMC Enterprise Companies."  (Docket Nos. 63-11; 63-15).

---

[5]    When Robinson first reported the alleged discrimination, she described Wills as being "white."  (Docket Nos. 72–21; 68-4 at 11).  But during her deposition, she admitted knowing that Wills was Asian-American.  (Docket No. 68-4 at 11 ("Well, I mean, I knew she was, you know, oriental, I don't know how to say it, but I was just—if you are not black, white, that was my, you know, mistake, when writing this.").

Following Robinson's termination, ID Connect learned of a data breach caused by Robinson on March 18, 2021.  (Docket No. 63-18).  Robinson, who had been working from home during the COVID-19 pandemic, emailed herself confidential information about medical providers and pharmacists so that she could print them for work purposes.  (*Id*; Docket No. 81-17 at ¶¶ 17–18).  According to Robinson, Zynn had permitted her to do so.  (Docket No. 81-17 at ¶¶ 19–23).  When Wills emailed Crisi-Couchenour about the breach, she asked "[w]ho in UPMC will be responsible for drafting" letters alerting the compromised individuals and referred to Robinson as a "UPMC Enterprises Employee."  (*Id.*).

Wills took on Robinson's credentialing tasks immediately following her termination.  (Docket No. 104 at 10).  Thereafter, Kathleen Schlingoff, a 55-year-old Caucasian, was hired as Robinson's replacement.  (Docket Nos. 72-3 at 199, 224; 81-16 at 6).

## III.    PROCEDURAL BACKGROUND

On October 1, 2021, Robinson sued ID Connect and UPMC in state court for age discrimination under the Age Discrimination in Employment Act ("ADEA"), race discrimination and retaliation under Title VII, and race and age discrimination under the Pennsylvania Human Relations Act ("PHRA"), (Docket No. 1–1 at 9–15); ID Connect for violating Pennsylvania's Wage Payment and Collection Law ("WPCL") and breach of contract, (*Id.* at 15–16); and UPMC for conspiracy to discriminate, (*Id.* at 16–17). UPMC removed the matter to this Court on January 5, 2022.  (Docket No. 1).  After UPMC's motion to dismiss for failure to state a claim was fully briefed, the Court ordered Robinson to file an amended complaint, which she did on May 4, 2022.  (Docket No. 29).  Thereafter, UPMC and ID Connect submitted their respective Answers on May 18, 2022.  (Docket Nos. 30; 31).

Following the completion of discovery, the parties filed cross-motions for summary judgment on June 8, 2022.[6]   Robinson moved for partial summary judgment against UPMC asserting that it was her joint employer.   (Docket No. 61).   ID Connect moved for summary judgment on the merits for all counts.   (Docket No. 69).   UPMC joined ID Connect's summary judgment motion and separately moved for partial summary judgment asserting that it was not Robinson's employer and that she failed to present sufficient evidence to support her alternative claim for civil conspiracy.   (Docket Nos. 65; 66).   The parties proceeded to brief and argue their respective positions for and against summary judgment.   (Docket Nos. 61-64; 65-68; 69-72; 75-81; 84-86; 88; 97; 99; 101-102; 104).   They likewise submitted additional briefs and exhibits regarding underlying evidentiary disputes which the Court addressed in separate Orders issued on September 12, 2023, and November 9, 2023.   (Docket Nos. 93; 105).   The parties further supplemented the record with the full transcript of Wills' deposition and corresponding exhibits. (Docket No. 104).   Accordingly, the Motions for Summary Judgment are ripe for disposition.

## IV.   LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law."   *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (citations omitted).   Further, "[a] dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'"   *Clews v. Cnty. of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

---

[6]   The Court notes that the case was mediated before Hon. Kenneth J. Benson but did not resolve at that time. (Docket No. 41).

non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

A party seeking summary judgment "must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 160 (3d Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings." *Conboy*, 992 F.3d at 160; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In this regard, the non-movant must come forward with more than "some metaphysical doubt as to the material facts." *Conboy*, 992 F.3d at 160; *see also Matsushita*, 475 U.S. at 586-87.

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, deposition testimony, admissions, and/or answers to interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

The summary judgment "standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). The Court "must rule on each party's motion on an individual and separate basis,

determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

## V.   DISCUSSION

As an initial matter, UPMC and Robinson have filed cross-motions for summary judgment on the issue of whether UPMC was her employer or not.  (Docket Nos. 61-64; 69-72; 75-76).  Both Defendants also seek summary judgment on Robinson's race and age discrimination, retaliation and attendant state-law claims.  (Docket Nos. 65–68; 69–72).  Robinson naturally opposes and argues that she has adduced sufficient evidence to present her case to a jury at trial.  (Docket Nos. 78–82, 84).

Having carefully considered the parties' arguments, the Court holds that a factfinder could reasonably conclude that UPMC was Robinson's employer, but that Robinson has failed to meet her burden of demonstrating that there is a genuine dispute of material fact as to her discrimination, retaliation, and related state law claims under the PHRA and for civil conspiracy.  Since all federal claims will be dismissed and the parties are not diverse, the Court will decline supplemental jurisdiction over her remaining state law claims under the WPCL and for breach of contract.

### A.   UPMC's Employer Status

In order to sustain her discrimination and retaliation claims, Robinson has a threshold burden to show that UPMC and ID Connect were her employers.  *See Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 212 (3d Cir. 2015).  ID Connect does not dispute its status as Robinson's employer.  (Docket No. 70).  UPMC asserts that ID Connect was, at all relevant times, Robinson's sole employer.  (Docket No. 76).  According to UPMC, it acted as an independent contractor by

providing services for ID Connect "at arm's length" under the requirements of the MASA and therefore cannot be held liable for discrimination or retaliation.  (Docket No. 76 at 2).

"Two entities may be 'co-employers' or 'joint employers' of one employee" under Title VII and the ADEA.  *Id.* at 215 (citing *Graves v. Lowery*, 11 F.3d 723, 727 (3d Cir. 1997)); *EEOC v. Zippo Mfg. Co.*, 713 F.2d 32, 38 (3d Cir. 1983) (explaining that courts apply the same standard for determining employee status under Title VII and the ADEA).  There are two well-established tests for determining employer status: the *Enterprise* Test and the *Darden* Test.  While the two tests are "extremely similar," courts apply the *Darden* Test to Title VII and ADEA cases and the Court will do so here.  *Faush*, 808 F.3d at 213, 214, n.6.

Under the *Darden* Test, courts are guided by "the general common law of agency" and "consider the hiring party's right to control the manner and means by which the product is accomplished."  *Id.* at 214 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)).  The Third Circuit "has generally focused on 'which entity paid the [employee's] salar[y], hired and fired [her], and had control over [her] daily employment activities.'"  *Id.* at 214 (quoting *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 119 (3d Cir. 2013)).  But "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive."  *Id.* (quoting *Darden*, 503 U.S. at 324).  To that end, the Court must consider a "non-exhaustive list of relevant factors" including,

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* (quoting *Darden*, 503 U.S. at 323–24).

"'When a legal standard requires the balancing of multiple factors, as it does in this case, summary judgment may still be appropriate even if not all of the factors favor one party,' so long as the evidence 'so favors' the movant that 'no reasonable juror' could render a verdict against it." *Id.* at 215 (quoting *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 471 (3d Cir. 2012)).  But the question "must be left to the jury if, on the other hand, reasonable minds could come to different conclusions on the issue." *Id.*

In this Court's estimation, the parties have presented conflicting evidence regarding whether Robinson was a UPMC employee or not such that there are genuine disputes of material fact precluding the entry of summary judgment in favor of either party.  On the one hand, reasonable minds could hear all of the evidence and conclude that UPMC was Robinson's employer.  In this regard, the relationship between ID Connect and UPMC was longstanding and extensive.  ID Connect was founded by UPMC physicians within UPMC before becoming an independent commercial entity funded by UPMC Enterprises.  (Docket No. 76 at 3).  Though it paid a fee to UPMC, ID Connect operated out of UPMC offices and used UPMC technology equipment.  (Docket Nos. 63-20 at 19:7–13; 64 at 2).  ID Connect employees communicated on UPMC emails.  (Docket Nos. 81-13; 81-14).  And as of January 2023, all of ID Connect's physicians were hired through UPMC and practiced using credentials from UPMC facilities. (Docket No. 64 at 5).

The Court believes that a reasonable jury could conclude that UPMC was a joint employer because it acted in each of the three areas highlighted by the Third Circuit in the *Darden* test.  *See Faush*, 808 F.3d at 214 ("Our Court has generally focused on which entity paid the employees' salaries, hired and fired them, and had control over their daily employment activities.") (citation, quotation marks, and brackets omitted).  First, UPMC exercised some control over Robinson's pay

and benefits.  Her pay raise was processed by UPMC and her retirement benefits were managed by UPMC's Retirement Center.  (Docket Nos. 63-5; 63-15; 76 at 4–5).  Second, UPMC assisted ID Connect with employment decisions.  A UPMC talent acquisition recruiter helped Zimmerman fill ID Connect's Senior Credentialing Manager position, (Docket No. 63-17); and Crisi-Couchenour, UPMC's human resources manager, played a central role in Robinson's termination by suggesting to Zynn that the company "may need to move forward with terminating [Robinson's] employment," (Docket No. 99-2 at 106), and seeking permission from UPMC's chief talent officer to terminate her employment.  (Docket Nos. 80 at 11; 63-16).  Finally, UPMC influenced Robinson's daily activities because she was directly supervised by a UPMC employee, Zimmerman, for several months, (Docket No. 80 at 4); her PIP was completed per UPMC policies on a UPMC document, (Docket Nos. 63-6; 76 at 5); and Crisi-Couchenour completed the investigation into Robinson's claims of discrimination, (Docket No. 72-21).

    With that said, a reasonable jury could weigh all of the evidence differently and conclude that ID Connect was Robinson's sole employer.  Much of UPMC's involvement with ID Connect was carried out pursuant to the MASA.  (Docket No. 68-3).  Under this agreement, UPMC performed "administrative services" as an "independent contractor" for fees ranging from $11,693.16 to $14,699.06 per month during the relevant period.  (Docket No. 68-3 at 12, 18–19, 22–23).  Although Crisi-Couchenour performed some vital tasks pertaining to Robinson's employment, her emails indicate that Zynn was the ultimate decisionmaker.  (Docket Nos. 99-2 at 116; 63-16).  For example, when Zynn asked Crisi-Couchenour whether Robinson was eligible for a merit pay increase, Crisi-Couchenour offered UPMC's guidelines but clarified, "[s]ince [ID Connect] is a portfolio company . . . it can be your call if you want to give [Robinson] an increase." (Docket No. 99-2 at 116).

"[T]he precise contours of an employment relationship can only be established by a careful factual inquiry." *Graves*, 117 F.3d at 729.  And neither Robinson nor UPMC has shown that the facts so clearly favor their own position such that summary judgment would be appropriate for either party.  The Court therefore finds that there are genuine disputes of material fact about UPMC's status as Robinson's employer.  *See, e.g., Logsdon v. UPMC*, No. 17cv1634, 2018 WL 10230686, at *1 n.1 (W.D. Pa. Sept. 18, 2018) ("Suffice it to say, there are genuine disputes of material fact as to whether UPP and UPMC maintain joint employer status.")  Accordingly, the Court denies Robinson's motion for summary judgment and UPMC's motion for summary judgment, in part.

### B.  Discrimination Claims

Since there are factual disputes as to UPMC's status as Robinson's employer, the Court next addresses the sufficiency of Robinson's discrimination claims against both Defendants. Robinson asserts that she was denied a promotion to the Senior Credentialing Manager position and later fired due to her race and/or age.  (Docket No. 29 ¶¶ 28, 32, 44, 48–49).

Title VII's anti-discrimination policy makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  The ADEA declares similar discrimination to be unlawful when based on age.  *See* 29 U.S.C. § 623(a)(1).  The PHRA, for its part, renders race and age discrimination unlawful under Pennsylvania law.  *See* 43 Pa. C.S.A. § 955(a), (d).  The PHRA is governed by essentially the same legal standard as Title VII and the ADEA. *See Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013) ("Claims under the PHRA are interpreted coextensively with Title VII claims."); *Hill v. Borough of Kutztown*, 455

F.3d 225, 247 (3d Cir. 2006) ("The same legal standard applies to a claim under the PHRA as applies to an ADEA claim.").

Robinson admits that she does not have direct evidence of race or age discrimination. (Docket No. 102 at 42).  As such, the familiar *McDonnell-Douglas* burden shifting framework guides the Court's analysis of Robinson's claims under Title VII, the ADEA, and the PHRA.  *See, e.g.*, *Nelatury v. Pa. State Univ.*, 633 F. Supp. 3d 716, 734 (W.D. Pa. 2022).  The plaintiff first bears the burden of presenting a prima facie case.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  To establish a prima face case of discrimination, "a plaintiff must show that 1) [she] is a member of a protected class, 2) [she] was qualified for the position [she] sought to attain or retain, 3) [she] suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Mandel*, 706 F.3d at 169.

If a plaintiff succeeds at the prima facie stage, the burden then shifts to the employer who must "articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802.  The burden at this stage is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Finally, at step three, the plaintiff bears the ultimate burden of showing that the employer's proffered reasons for the employment action are a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 807.  A plaintiff can show pretext by "point[ing] to some evidence, direct or circumstantial from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.  A plaintiff must do more than "simply show that the employer's decision is wrong or

mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. She must provide evidence that could "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Id.* at 765 (citations omitted).

Under the first prong of the *Fuentes* test, a "plaintiff must point to evidence indicating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons.'" *Surman v. UPMC Presbyterian Shadyside*, Civ. A. No. 17-184, 2018 WL 4901107, at *9 (W.D. Pa. Oct. 9, 2018) (quoting *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 644–45 (3d Cir. 2015)) (quotation marks and citation omitted). "The question at prong one . . . is not whether the employer made the best, or even a sound, business decision, it is whether the real reason for the employment decisions is discrimination." *Id.* (quoting *Bliech v. Johnson & Johnson, Inc.*, 6 F. Supp 3d 589, 608 (W.D. Pa. 2014) (quotation marks and citation omitted); *see also Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005) (quoting *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1216 (3d Cir. 1988)) ("Our inquiry must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee.").

Under prong two, "a plaintiff must provide evidence that allows the factfinder to infer that discrimination was the 'but-for' cause of the employer's decision." *Id.* (quoting *Anderson v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 741 (E.D. Pa. 2015) (citation omitted). "The plaintiff can show pretext this way by presenting evidence 'with sufficient probative force' so as to allow the factfinder to 'conclude by a preponderance of the evidence that age [or race] was a motivating or

determinative factor." *Willis*, 808 F.3d at 645 (quoting *Simpson v. Kay* Jewelers, 142 F.3d 639, 644–45 (3d Cir. 1998)).  Examples include showing that the employer has previously discriminated against the plaintiff, that the employer has discriminated against members of the plaintiff's protected class or another protected class, or that similarly situated people not within plaintiff's class were treated more favorably.  *Simpson*, 142 F.3d at 645 (citing *Fuentes*, 32 F.3d at 765).

The Court first considers Robinson's claims that she was denied a promotion because of her race and/or age before analyzing her termination.

### 1. Title VII, ADEA and PHRA Failure to Promote Claims

Defendants argue that Robinson cannot make out a prima facie case of discrimination for failure to promote because she never applied for the senior position of which she was supposedly deprived.  (Docket No. 70 at 5).  Robinson responds that it would have been "futile" to apply because the posting stated that the credentialing supervisor position required a college degree, and ID Connect personnel knew she was not a college graduate.  (Docket No. 84 at 6).

At the outset, the parties do not dispute that Robinson is a member of protected classes covered by Title VII and the ADEA as she is African American and was 61 years old at the time she was allegedly denied the promotion.  The Court thus focuses on the remaining elements of her prima facie case.  To satisfy the second and third elements of a prima facie case for a failure to promote claim, a plaintiff must generally show that she applied for an open position and was denied.  *See, e.g.*, *McDonnell Douglas Corp*, 411 U.S. at 802; *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010); *Robinson-Stowe v. Sch. Dist. of Phila.*, Civ. No. 13-6907, 2014 WL 6973014, at *5 (E.D. Pa. Dec. 9, 2014).  But there are exceptions.  A plaintiff need not file a formal application when she can demonstrate that she "made every reasonable attempt to convey [her] interest in the job to the employer," *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990), she would have

applied but for her employer's discriminatory practices, or she "had a real and genuine interest in [the position] but reasonably believed that a formal application would be futile." *Newark Branch, NAACP v. Harrison*, 907 F.2d 1408, 1415 (3d Cir. 1990); *see, e.g., McClintock v. City of Phila.*, No. 20-3453, 2022 WL 395995, at *3 (3d Cir. Feb. 9, 2022).

In this Court's estimation, Robinson has failed to present sufficient evidence to establish a prima facie case that she was not promoted due to race and/or age discrimination. First, Robinson has not demonstrated that she made every reasonable attempt to convey her interest in the position. ID Connect did not conduct "an informal, secretive selection process." *See Metal Serv. Co.*, 892 F.2d at 350; *see e.g., Goodman v. Norristown Area Sch. Dist.*, 2020 WL 5292051, at *4–5 (E.D. Pa. Sept. 4, 2020) (noting that plaintiffs need not show that they applied for the job where the process was "secretive."). The job was publicly posted, and Robinson saw that it was posted. (Docket Nos. 29 at ¶ 21; 81-17 at ¶ 29–31). In such situations, a plaintiff can demonstrate that she has made every reasonable attempt to convey interest in a position by "follow[ing] precisely the procedure established by [the employer] for how a person applies for a job at the company." *Metal Serv. Co.*, 892 F.2d at 349; *see, e.g., Schultz v. Goldbelt Glacier Health*, 713 F. App'x 121, 127–28 (3d Cir. 2017) (finding that a social worker failed to make a reasonable effort to convey her interest in a position when "she knew or should have known how the application process worked" but did not submit an application). However, the record is uncontested that Robinson neither formally applied for the position nor expressed an interest in the job to Zimmerman. Per Robinson's testimony, she spoke several times with Zimmerman about hiring a credentialing specialist to work under her. (Docket No. 81–17 at ¶ 25, 29, 32). But she does not point to any evidence that she expressed an interest to Zimmerman, Zynn, or Abdel-Massih in the Senior Credentialing Manager position.

Second, Robinson did not offer any evidence that ID Connect engaged in discriminatory practices which deterred her from applying.  Robinson submits in her complaint that she did not experience disparate treatment until after Wills was hired for the position and became her supervisor.  (Docket No. 29 at ¶ 23).  Although she testified that she now believes that Zimmerman and Abdel Massih discriminated against her, she admits that no one at ID Connect made any comments related to her age or race.  (Docket Nos. 72-3 at 59; 68-5 at 22).

Third, Robinson has not established futility.  She asserts that it would have been futile to apply for the position because she did not have a college degree, which the posting listed as a requirement. But Robinson is conflating "futility" with "unqualified." She has not cited to any evidence supporting an inference that ID Connect established the degree requirement to deprive her of a promotion due to her race.  *See, e.g., Schultz*, 713 F. App'x at 128–29 ("without any evidence that the [employer's] proffered rationale is pretextual, we think it inappropriate to second-guess its determinations of what the appropriate qualifications for the position are"); *Steele v. Pelmor Labs. Inc.*, 642 F. App'x 129, 135 (3d Cir. 2016) (citation, quotation marks, and brackets omitted) ("the fact that a court may think that the employer misjudged the qualifications of the applicant does not in itself expose him to Title VII liability").  And Robinson cites no case holding that the Court should overlook a failure to file an application based on a subjective belief by the would-be applicant that an application would fail.  *But see Robinson v. Matthews Int'l Corp.*, Civ. No. 06–1504, 2009 WL 735876, at *10 (W.D. Pa. Mar. 20, 2009) (finding it would have been futile for the plaintiff to apply when he had already been considered and rejected for the position without notice); *EEOC v. Foodcrafters Distrib. Co.*, No. Civ. 03–2796, 2006 WL 489718, at *11 (D.N.J. Feb. 24, 2006) (finding that an application would have been futile when female applicant was told "that her gender rendered her unsuitable for the job"); *Hailes v. United Air Lines*, 464

F.2d 1006, 1007 (5th Cir. 1972) (holding that a male plaintiff need not apply to a job posting for females to sustain a claim of Title VII sex discrimination).

In any event, Robinson has not sufficiently demonstrated that she was qualified for the Senior Credentialing Manager role because she has not shown "that the person who filled the desired position had equivalent or lesser qualifications." *Gilmore v. Macys Retail Holdings, Inc.*, 385 F. App'x 233, 237 (3d Cir. 2010) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 541-42 (3d Cir. 2006)). To the contrary, the undisputed facts in the record demonstrate that Wills had objectively superior qualifications and was much better suited to take over the role which had been held by Zimmerman. At the time of her hire, Wills had three advanced degrees and prior experience supervising a credentialing team of eighteen to twenty people. (Docket No. 105 at 7–9, 13–15). Robinson had no advanced degrees and no supervisory experience. (Docket Nos. 72-5 at 2–3; 81-17 at ¶ 33). As such, there is no genuine dispute of material fact that Wills was significantly more qualified than Robinson. *See, e.g., Gilmore*, 385 F. App'x at 237.

All told, the Court finds that Robinson has failed to present sufficient evidence to establish a prima facie case of race and age-based failure to promote claims under Title VII, ADEA, and PHRA. If she had met her burden, the Court alternatively notes that Defendants have sufficiently articulated legitimate, non-discriminatory reasons for not promoting her because she did not apply for the position and Wills was objectively more qualified for the supervisory role and Robinson has not shown that these reasons are a pretext for race and/or age discrimination. *See Fuentes*, 32 F.3d at 764. Therefore, summary judgment will be entered in favor of ID Connect and UPMC and against Robinson on such claims.

2.   <u>Title VII, ADEA & PHRA Termination Claims</u>

Moving on, Defendants further assert that Robinson cannot make out a prima facie case that her termination was motivated by race discrimination or show that their legitimate reasons for termination were a pretext for age discrimination.  (Docket Nos. 70 at 10, 16; 102 at 33–35).  They claim that Robinson has failed to point to any facts raising an inference of discrimination, relying instead on her own subjective beliefs, and observe that Robinson has not offered a comparator outside of her protected class who was treated more favorably.  (Docket No. 70. at 10–11).  Robinson responds that comparators, while useful, are not necessary.  (Docket No. 84 at 7).  Instead, she points to the PIP, her sour relationship with Wills, and a purported negative change in behavior by her superiors after she sought out a leadership role.  (*Id.* at 8).  Robinson also notes that she was replaced by a younger woman, (*id.* at 12) and that the only other ID Connect employee to be placed on a PIP and fired was  African American, (*id* at 7).

i.      Prima Facie Case of Race & Age Discrimination

Upon review of the evidence in light most favorable to Robinson and drawing all reasonable inferences in her favor, it appears to the Court that Robinson has successfully demonstrated a prima facie case of race and age discrimination because she was fired from a job for which she was qualified and replaced by a woman outside her protected class who was sufficiently younger.  *See Thompson v. UPMC Presbyterian Shadyside*, Civ. A. No. 02:10-CV-1488, 2012 WL 3245476, at *5 (W.D. Pa. Aug. 8, 2012) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403 at 410–11 (3d Cir.1999)) ("This inference [of discrimination] may be reached when a person not of the protected class fills the position."); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) ("Petitioners do not challenge the District Court's finding that respondent satisfied the minimal requirements of such a prima facie case . . . by proving (1) that he is black, (2) that he

was qualified for the position of shift commander, (3) that he was demoted from that position and ultimately discharged, and (4) that the position remained open and was ultimately filled by a white man."). Here, the evidence reflects that Robinson was the only African American employee at ID Connect and she was replaced by Schlingoff who is Caucasian and was 55 years' old, or 5 years younger than Robinson, at the time. (Docket Nos. 72-3 at 199, 224; 81-16 at 6). Given same, the record appears sufficient to establish a prima facie case of race and age discrimination for purposes of the instant motions for summary judgment.

### ii.   ID Connect and UPMC's Reasons for Termination

The prima facie case having been established, the burden now shifts to ID Connect and UPMC to "articulate some legitimate, nondiscriminatory reason" for the termination. *McDonnell Douglas Corp.*, 411 U.S. at 802. The employers have met their "relatively light" burden here. *Fuentes*, 32 F.3d at 763. Per Robinson's termination letter, she was fired for failing to "consistently [meet] the expectations of [her] PIP" and for acting in a manner that Wills perceived as "unprofessional." (Docket No. 63-15). More specifically, Wills noted that Robinson provided incomplete updates on physician licensing and credentialing, failed to properly use the Modio software, and did not follow instructions that she "deemed . . . too time consuming or unnecessary." (*Id.*). Poor work performance and unprofessional conduct qualify as legitimate, nondiscriminatory reasons for termination. *See Farzan v. Vanguard Grp. Inc.*, 582 F. App'x 105, 107 (3d Cir. 2014) (citing *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014)) (poor performance); *Chipollini v. Spencer Gifts*, 814 F.2d 893, 896 (3d Cir. 1987) (declining performance and uncooperative attitude).

iii.     Pretext

The burden shifts back to Robinson.  She insists that these stated reasons were mere pretext. (Docket No. 84 at 10).  Robinson makes two arguments. First, she challenges the charge of poor performance and the reason that she was placed on the PIP.  (*Id.*).  As evidence, Robinson submits Zimmerman's expression of gratitude for a job well done, her pay raises, Wills' role in placing her on the PIP, and the fact that the only other employee to be placed on a PIP and fired was also African American.  (*Id.*).  Second, she attacks Wills' accusation of unprofessionalism by citing her contentious relationship with Wills over the years.  (*Id.* at 10-11).  The Defendants counter that Robinson simply disagrees with the business decisions of the companies, which, the Court is precluded from second guessing.  (Docket No. 84 at 15).

After reviewing the evidence in the light most favorable to Robinson, it is this Court's opinion that Robinson has failed to meet her "difficult burden" to establish pretext under either prong one or two of *Fuentes*.  *Fuentes*, 32 F.3d at 765.  The Court will address each prong, in turn.

"To discredit the employer's proffered reason" for her termination under *Fuentes* prong one, Robinson must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Id.* (citation, quotation marks, and emphasis omitted).  And she must do this for "*each* of the employer's proffered nondiscriminatory reasons"—failure to meet PIP goals and unprofessional behavior.  *Id.* at 764.

Initially, Robinson has failed to adequately present a genuine dispute of material fact undermining that she was fired for failing to meet PIP goals.  She presents evidence of positive performance reviews that predate Wills' hiring and the PIP period.  Yet, the Court of Appeals has repeatedly held that "prior good evaluations alone cannot establish that later unsatisfactory

evaluations are pretextual." *Billet*, 940 F.2d at 826.  Even more, the evidence does not support Robinson's general claim that "there were no performance issues until [she] attempted to fulfill a leadership role." (Docket No. 84 at 10). To the contrary, Robinson's supervisors documented performance issues throughout her term of employment. Zynn graded her as a 3 out of 5 in his 2019 review and noted certain deficiencies in her work. (Docket No. 72-9 at 4–6). In June 2020, Abdel Massih noted "serious red flags" with Robinson's performance and directed Zimmerman to document her concerns. (Docket No. 81-13). Zimmerman responded that she had already created a file to track Robinson's performance issues and referenced a continuing problem with Robinson's "convoluted and often blatantly inaccurate pattern of communication." (*Id.*). In February 2021, Zynn explained to Crisi-Couchenour that Robinson "continues to not recognize her weaknesses," which he had identified in his 2019 evaluation. (Docket No. 81-14).

Robinson further asserts that Wills did not have enough experience as her supervisor to evaluate her performance during 2020 and to place her on the PIP because she had only joined ID Connect in October. The evidence, however, indicates that the decision to put Robinson on the PIP was made by Zynn, not Wills. In January 2021, Zimmerman emailed Zynn to discuss issues identified by Wills with Robinson's performance. (*Id.*). Zynn then wrote to Crisi-Couchenour to express the "need to move [Robinson] to a PIP" based on his impression that she "will not work to improve." (*Id.*). Crisi-Couchenour endorsed the PIP as the HR representative. (Docket No. 72-17). Throughout the PIP, Wills provided regular progress updates to Zimmerman, Zynn, and Crisi-Couchenour and sent them recordings of the weekly meetings. (Docket No. 99-2 at 86–115, 119–136).

Though Robinson's employment was terminated because she failed to meet the goals of her PIP, only once does she directly confront the performance issues documented during the PIP

period.  She points to a single email she sent to Wills in February of 2021 as evidence that Wills was "riding [her] for issues that did not exist."  (Docket No. 84 at 11).  In the correspondence, Wills rebuked Robinson for not reporting a missed deadline.  (Docket No. 81-9).  Robinson responded that she had copied Wills on emails requesting the necessary forms from three physicians.  (*Id.*).  Given that Robinson was fired for failing to perform in five different areas, (Docket No. 63-15); a single email is insufficient evidence that performance issues "did not exist," (Docket No. 84 at 11).  If anything, this email indicates that Robinson was failing to meet the PIP directive to "[p]rovide timely communication to the team about potential issues with the credentialing process."  (Docket No. 72-17 at 5).

The Court next finds that Robinson has failed to present sufficient evidence to create a genuine dispute of material fact of ID Connect's assessment that she behaved unprofessionally.  It is Robinson's burden to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in" ID Connect's decision to fire her for unprofessionalism "that a reasonable factfinder could rationally find them unworthy of credence."  *See Fuentes*, 32 F.3d at 765 (citation, quotation marks, and emphasis omitted).  As before, Robinson does not directly confront ID Connect's charge of unprofessionalism.  Instead, Robinson asserts that Wills "was treating her as a sub-human being" and that she was left in tears after certain meetings.  (Docket No. 84 at 10).  Robinson does not contest the statement in the termination letter that she had to be counseled by both Wills and Zynn that her interactions during the PIP meetings were perceived as unprofessional.  She attempts to sidestep her burden to challenge such facts by pointing to Wills' behavior, rather than defending her own.

The Court next evaluates whether Robinson has provided evidence "from which a factfinder could reasonably believe . . . that an invidious discriminatory reason was more likely

28

than not a motivating or determinative cause of the employer's action" under *Fuentes* prong two. *Fuentes*, 32 F.3d at 764.   A plaintiff may succeed by showing that the employer has previously discriminated against the plaintiff, that the employer has discriminated against members of the plaintiff's protected class or another protected class, or that similarly situated people not within plaintiff's class were treated more favorably.   *Simpson*, 142 F.3d at 645 (citing *Fuentes*, 32 F.3d at 765).

It appears to the Court that Robinson has not presented sufficient evidence to create a genuine dispute of material fact that she was subject to prior discrimination.   She admits that no one at ID Connect "ever made any comments to [her]. . . related to [her] age and race" and that she never overheard any such comments.   (Docket Nos. 72-21; 72-3 at 57–59; 68-4 at 22). Robinson also conceded that no one at UPMC ever made any racial comments or slurs toward her, but she claims that Wills discriminated against her at UPMC by "talk[ing] down to [her], like [she] was nobody."   (Docket No. 68-4 at 19, 22).   With that said, "Title VII does not set forth 'a general civility code for the American workplace.'"   *Muhammad Kebe v. Wash. Twp. Sch. Dist.*, No. 23-1366, 2024 WL 243339, at *2 (3d Cir. Jan 23, 2024) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *see also Williams v. Pa. Hum. Rels. Comm'n*, No. CV 14-1290, 2016 WL 6834612, at *23 (W.D. Pa. Nov. 21, 2016), *aff'd*, 870 F.3d 294 (3d Cir. 2017) ("an employee is neither entitled to a workplace free from discourteous behavior nor a utopian one. [Plaintiff] would have the Court enforce an odd civility code under the guise of anti-discrimination laws that would require her supervisors to always treat her with kindness and courtesy though she not be required to extend the same, which the Court will not and cannot do.").

And Robinson's "general allegations are insufficient to give rise to a plausible inference of discrimination."   *See id.; see, also, Mercado v. Wells Fargo*, Civ. No. 15-4086, 2017 WL 4862417,

at *7 (D.N.J. Oct. 27, 2017) ("The plaintiffs offer no examples of prior discriminatory treatment— no racially charged remarks; no disparate treatment with respect to salaries or working conditions—indeed, no actions remotely of that kind.").

Robinson has likewise failed to proffer evidence that ID Connect or UPMC discriminated against other members of her protected class or a different protected class which would suffice to raise an inference of discrimination.  In an attempt to do so, Robinson notes that the only other ID Connect employee to be placed on a PIP was an African American who was likewise fired.  But Robinson does not provide any more information to explain how this the dismissal of this individual was motivated by racial discrimination.  Nor does she attempt to establish that this employee, a 49-year-old software developer working in a different department, (Docket No. 81-16 at 7), is an acceptable comparator because he is not similarly situated in all relevant respects. *See Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004) ("In order to determine who might qualify as a similarly situated employee we must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace."); *Mandel*, 706 F.3d at 170 ("an employee who holds a different job in a different department is not similarly situated").  Even more, ID Connect's decision to hire Wills to fill a supervisory position weighs against a finding that ID Connect maintained a practice of discriminating against protected classes because she is a member of a protected class of Asian immigrants. *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2199 (2023) (Thomas, J. concurring) ("Yet, Asian Americans can hardly be described as the beneficiaries of historical racial advantages."); *Mercado*, 2017 WL 4862417, at *8 (quoting *Glover-Daniels v. 1526 Lombard St. SNF Operations LLC*, No. 11-5519, 2012 WL 2885935, at

*11 (E.D. Pa. July 16, 2012) ("employer's diverse workforce 'cuts against an inference of discrimination'").

Finally, Robinson has not met her burden to show that ID Connect treated similarly situated employees outside her protected class more favorably.  While Robinson and Schlingoff, her Caucasian replacement, worked in the same roles, the Court cannot find any evidence in the record that Schlingoff "engaged in the same conduct" as Robinson and that she was treated more favorably under similar circumstances.  *See e.g. id.* (citation omitted); *Hodczak v. Latrobe Specialty Steel Co.*, 451 F. App'x 238, 242 (3d Cir. 2011) (explaining that a proposed comparator was not similarly situated because he did not engage in the same misconduct).

Overall, this Court's evaluation of the record in light of the prevailing standards leads it to conclude that Robinson has failed to present sufficient evidence to create a genuine dispute of material fact that the legitimate, non-discriminatory reasons provided for her termination were a pretext for unlawful race or age discrimination.  *See Fuentes*, 32 F.3d at 764.  Hence, summary judgment will be entered in favor of ID Connect and UPMC on Robinson's Title VII, ADEA and PHRA claims that her termination was unlawfully based on her race and/or age.

### C.  *Race Discrimination-Based Hostile Work Environment*

Defendants further contend that Robinson failed to establish a hostile work environment claim because she has not provided evidence of severe or pervasive intentional discrimination based on her race.  (Docket No. 70 at 6–10).  Robinson responds by pointing to her negative work experience with Wills at UPMC that she claims continued at ID Connect.  (Docket No. 84 at 9). Having carefully evaluated the record, the Court finds that Robinson has failed to adduce sufficient evidence to sustain a hostile work environment claim.

To establish a hostile work environment, a plaintiff must show that "(1) [s]he suffered intentional discrimination; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." *Komis v. Sec'y of the U.S. Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019) (citation omitted). When assessing the severity of workplace conduct, courts consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998).

Robinson has failed to show that she suffered severe or pervasive discrimination. She has offered no evidence of racist utterances, threats, or instances of humiliation. *See e.g.*, *Blango v. City of Phila.*, 643 F. Supp. 3d 535, 545–46 (E.D. Pa. 2022). Without "evidence of overtly racial comments or conduct," the Court cannot find that her supervisors' facially neutral treatment, albeit "nasty" and "hostile," treatment toward her, was racially motivated for purposes of a hostile work environment claim. *See Ilori v. Carnegie Mellon Univ.*, 742 F. Supp. 2d 734, 757 (W.D. Pa. 2010); *see also Alers v. City of Phila.*, 919 F. Supp. 2d 528, 546 (E.D. Pa. 2013) (finding that a few instances of workplace bullying and overtime request denials did not qualify as "severe or pervasive" behavior).

For these reasons, summary judgment will be entered in favor of ID Connect and UPMC on Robinson's Title VII and PHRA hostile work environment claims.

*D. Retaliation*

Defendants next assert that Robinson failed to establish a prima facie case of retaliation because she has not provided evidence of a causal link between her discrimination complaint to

HR and her termination.  (Docket No. 70 at 17–19).   They alternatively maintain that Robinson has failed to show pretext.  (*Id.* at 19).  Robinson counters that the timing of her termination was "unusually suggestive" such that she needs no other evidence of a causal link.  (Docket No. 84 at 14 (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012)).

Title VII's anti-retaliation provision shields those who contest discrimination by rendering it unlawful "for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge . . . under [Title VII].  42 U.S.C. § 2000e-3(a).  The familiar *McDonnell Douglas* approach applies to claims of retaliation.  *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).  To make out a prima facia case of retaliation, a plaintiff must provide evidence that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  *Id.* at 340–41 (citation omitted).

The parties do not contest that Robinson engaged in protected activity by complaining to HR nor that she was subject to an adverse action when she was fired.  The crux of their disputes is whether the record contains sufficient evidence to establish causation.  A plaintiff can establish a causal link by pointing to an "unusually suggestive" temporal proximity between the protected activity and the adverse employment action.  *Lichtenstein*, 691 F.3d at 307.  In *Lichtenstein*, the Third Circuit recognized that seven days "is in the realm of what [it] and others have found sufficient at the prima facie stage."  *Id.* "To the extent that [a plaintiff] relies upon the brevity of the time periods between the protected activity and alleged retaliatory actions to prove causation, […] [s]he will have to show […] that the decision maker had knowledge of the protected activity."

*Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (internal citations omitted).

Here, Robinson was fired on March 30, 2021, seven days after complaining about discrimination to HR.  (Docket No. 80 ¶ 48).  But the uncontested facts set forth in the summary judgment record demonstrate that Robinson was on a PIP which was set to expire by March 27, 2021 and that the decision to terminate Robinson's employment was made by March 18, 2021, five days before Robinson complained about discrimination to HR.  (Docket Nos. 63-16; 77-4). To that end, on March 18, Crisi-Couchenour emailed Cook asking for her "approval to proceed with termination of Roxanne Robinson" citing a failure to "meet the expectations of her PIP," and noting that Zynn was in favor of termination.   (Docket No. 63-16).   Wills also sent Crisi-Couchenour a draft termination letter on the same date which set an effective termination date of "March 24, 2021." (Docket No. 63-13 at 2).  Because the undisputed facts show that ID Connect and UPMC had decided to fire Robinson before she made her discrimination complaint and the decisionmakers therefore lacked knowledge of same, her retaliation claim fails. *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006) (citing *Clark Cnty Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)) ("an employer need not refrain from carrying out a previously reached employment decision because an employee subsequently claims to be engaging in protected activity"); *Layman v. Honeywell Int'l Inc.*, 645 F. Supp. 3d 443, 460 (W.D. Pa. 2022) (quoting *Clark Cnty. Sch. Dist.*, 532 U.S. at 272) ("The Defendant's decision to 'proceed[] along lines previously contemplated, though not yet determined, is no evidence whatever of causality.'").

Even if the termination decision had not been made before Robinson's complaint, she has not presented sufficient evidence to create a genuine dispute of material fact that the

decisionmakers, i.e., Zynn of ID Connect and/or Cook of UPMC, had knowledge of the March 23, 2021 discrimination complaint before Robinson was fired on March 30, 2021. *See Moore*, 461 F.3d at 351. In this regard, Robinson made the initial email report to Crisi-Couchenour and admitted at her deposition that she declined to provide details to her in the follow-up interview. Wills testified that she likely learned that Robinson had complained about discrimination from Crisi-Couchenour but that she did not recall when she became aware of her complaint. (Docket No. 104 at 71-72). However, neither Crisi-Couchenour nor Cook were deposed and while Zynn did sit for a deposition, the record lacks evidence establishing that Zynn or Cook were aware of Robinson's complaint before her employment was terminated. *See Moore*, 461 F.3d at 351. Given same, the record lacks sufficient evidence from which a reasonable jury could infer that Robinson was fired in retaliation for her making her complaint to H.R. *See id.* Based on the foregoing, the Court holds that Robinson has not met her burden to create a genuine dispute of material fact that she was retaliated against after she made her complaint of discrimination. *See Moore*, 461 F.3d at 351. With that said, for the reasons previously expressed in § V.C. of this Opinion, Defendants have articulated legitimate non-retaliatory reasons for terminating Robinson's employment and she has failed to show that those reasons are a pretext for retaliation. *See* § V.C., *supra*. Accordingly, summary judgment will be entered in favor of ID Connect and UPMC on Robinson's Title VII and PHRA retaliation claim.

   E.   *Civil Conspiracy*

Robinson also asserts that UPMC engaged in a civil conspiracy with ID Connect to dismiss her complaints of discrimination. (Docket No. 29 at 14).[7] "A claim for civil conspiracy requires

---

[7]        As opposed to Robinson's breach of contract and WPCL claims, the Court finds that judicial economy favors the retention of supplemental jurisdiction over her contingent civil conspiracy claim because the Court has already resolved the underlying claims.

that two or more people conspire to do an unlawful act.".  *McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005).  Since Robinson's civil conspiracy claim is contingent upon her proving that Defendants engaged in unlawful discrimination, and the Court has granted summary judgment for the Defendants on Robinson's discrimination claims, summary judgment will be entered in favor of UPMC on Robinson's civil conspiracy claim as well.

F.  *Breach of Contract and WPCL Claims*

As summary judgment has been granted in favor of the Defendants on all federal claims, the Court will decline supplemental jurisdiction over Robinson's state law claims that ID Connect and UPMC breached her employment contract and violated the WPCL by withholding compensation for unused PTO for the following reasons.

"[D]istrict Courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  This principle applies even when resolution of the federal claims occurs at the summary judgment stage.  *See, e.g., Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 254 (3d Cir. 2008) ("Because all federal issues have been decided on summary judgement[,] . . . we will decline to exercise supplemental jurisdiction over [the plaintiffs'] pendant state law claim."); *Gautier-James v. Hovensa, L.L.C.*, Civ. No. 2006-106, 2023 WL 4532194, at *4 (D.V.I. July 12, 2023) ("courts have declined to exercise supplemental jurisdiction even at later stages of litigation than exists here, including after the summary judgment phase").

"The decision to retain or decline jurisdiction over state-law claims is discretionary."  *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009) (citation omitted).  But the Third Circuit has instructed district courts to "decline to decide the pendant state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing

so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000). When a court decides not to exercise supplemental jurisdiction and dismisses state-law claims, "it should do so without prejudice, as there has been no adjudication on the merits." *Kach*, 589 F.3d at 650.

Having considered judicial economy, convenience, and fairness, the Court finds no affirmative justification for exercising supplemental jurisdiction over Robinson's breach of contract and WPCL claims. Neither the Court nor the parties have committed substantial resources to the issue of Robinson's employment contract. The Court's role as been more like those courts who have decided not to exercise supplemental jurisdiction, *see, e.g., Gautier-James*, 2023 WL 4532194, at *4 ("the extent of the Court's involvement has been to coordinate discovery, manage scheduling, and resolve evidentiary disputes"), than those who have retained jurisdiction, *see, e.g., Levine v. Voorhees Bd. of Educ.*, Civ. No. 07-1614, 2009 WL 2424687, at *3 (D.N.J. Aug. 6, 2009) ("A review of the docket alone tells the story of a two and one-half ear old case involving numerous motions, countless letters and affidavits, numerous in-person conferences (both formal and informal), over fifty Court Orders and/or Opinions, and three appeals of the decisions of the Magistrate Judge."). And the litigants have focused on UPMC's status as an employer and the alleged acts of discrimination and retaliation. Robinson's assertion that she was unlawfully deprived of uncompensated PTO is a separate argument that rests upon the existence and interpretation of a contract, not any discrimination or retaliation. (Docket No. 29 at 12–13). ID Connect dedicated only one page of its twenty-page summary judgment brief to Robinson's breach of contract and WPCL claims. (Docket No. 70 at 19–20). Robinson did not address the claims in her response at all. (Docket No. 84). And ID Connect abandoned them in its reply. (Docket No. 86).

Though there has been extensive discovery in this case, there has been little evidence produced regarding Robinson's employment contract and ID Connect's PTO policy.  The only evidence purporting to clarify ID Connect's PTO policy was an employee handbook struck from the record by this Court because "it [did] not appear that [the handbook] was in effect during Plaintiff's employment IDC."  (Docket No. 105 at 6).  In any event, the Third Circuit has "reiterated . . . on several occasions" that "'substantial time devoted to the case' and 'expense incurred by the parties' [do] not constitute extraordinary circumstances" justifying the retention of jurisdiction over state-law claims.  *City of Pittsburgh Comm'n on Hum. Rels. v. Key Bank USA*, 163 F. App'x 163, 166 (3d Cir. 2006) (citing *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195 (3d Cir. 1976)) (quotation marks omitted).

Accordingly, the Court denies ID Connect's motion for summary judgment on Robinson's state law claims of breach of contract and violation of the WPCL.  These claims are dismissed, without prejudice.[8]

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [61] is denied, Defendant UPMC's Motion for Summary Judgment [65] is granted, in part and denied, in part, and Defendant ID Connect's Motion for Summary Judgment [69] is granted, in part and denied, in part.  The remaining state law claims will be dismissed, without prejudice.  An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated:  February 22, 2024

---

[8]      Allegheny County has a robust mediation program that is mandatory for all civil suits. *See* Allegheny Cnty. Rule 212.7.

cc/ecf:  Counsel of record